UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ANTHONY BENNETT,

                   Plaintiff,

       - against -

DANIELLE DILL, Psy. D. Acting Executive
Director Central New York Psychiatric Center,

                 Defendant.
--------------------------------------------------------x

                                **MEMORANDUM & ORDER**
                                21-CV-1450 (PKC)

PAMELA K. CHEN, United States District Judge:

      On March 8, 2021, Petitioner Anthony Bennett, currently civilly committed at the Central New York Psychiatric Center,[1] filed a *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 ("Petition"), challenging his confinement.  (Dkt. 1.)  Petitioner filed an application to proceed *in forma pauperis* ("IFP") (Dkt. 7), which the Court granted on April 23, 2021 (Dkt. 8).  On October 7, 2021, Respondent Danielle Dill filed a response.  (Dkt. 18.)  On October 21, 2021, Petitioner filed a motion to appoint counsel (Dkt. 20), which was denied by this Court on October 25, 2021 (10/25/2021 Docket Order).   For the reasons below, the Petition is denied in its entirety.

## BACKGROUND

---

[1] Central New York Psychiatric Center is located in Marcy, New York.  (Dkt. 18, at 2.) While the facility is not within the Eastern District of New York, the order to commit Petitioner was issued by the New York State Supreme Court, Queens County, which is located in this district. 28 U.S.C. § 1404(a); *see also* L. Civ. R. 83.3 ("Unless otherwise provided by statute, applications for a writ of habeas corpus made by persons under the judgment and sentence of a court of the State of New York shall be filed, heard and determined in the District Court for the district within which they were convicted and sentenced.").

## I.      Factual and Procedural Background

In 1979, Petitioner was convicted of rape, sodomy, and criminal possession of a weapon for four separate offenses relating to five girls and women who were between eleven to twenty-three years old.  (SR.,[2] 109, 110.)  While on parole for these convictions in January 1984, Petitioner raped another woman and was convicted of rape (N.Y. Penal Law § 130.35), sodomy (N.Y. Penal Law § 130.50), and sexual abuse (N.Y. Penal Law § 135.10).  (SR. 19, 109.)  Petitioner was sentenced to an indeterminate term of twelve and one-half to twenty-five years.  (SR. 19.)  In July 2013, near the expiration of Petitioner's maximum sentence, the State of New York ("State") commenced a sex offender civil management proceeding against Petitioner under Article 10 of the New York Mental Health Law ("MHL").[3]  (SR. 111–14.)

Prior to the first phase of his Article 10 proceeding, *i.e.*, a trial to determine whether he was suffering from a mental abnormality, Petitioner moved for a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) ("*Frye* hearing"), challenging the findings of the State's

---

[2] Citations to "SR" refer to the consecutively paginated State Court Record (Dkts. 16, 17), not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[3] The Article 10 proceeding was "designed to reduce the risks posed by and to address the treatment needs of those sex offenders who suffer from mental abnormalities that predispose them to commit repeated sex crimes."  *Matter of State v. Rashid*, 16 N.Y.3d 1, 5 (2010); *see* MHL § 10.01(a)-(b).  If the State Office of Mental Health ("OMH") determines that a sex offender suffers from a "mental abnormality," it refers the case to the New York Attorney General who, after a probable cause hearing, *id.* §§ 10.06(g), 10.07(a), initiates an Article 10 proceeding, *id.* §§ 10.05(g), 10.06(a). *See also id.* § 10.05(d)-(e) (outlining sex offender screening by the OMH)).  Article 10 proceedings have two phases: (1) the fact-finder determines whether there is clear and convincing evidence that the respondent is "a detained sex offender who suffers from a mental abnormality," *id.* § 10.07(d)) and (2) if the fact-finder concludes the respondent suffers from a mental abnormality, the court will hold a dispositional hearing to determine whether the respondent should be committed to a secure treatment facility or undergo a "strict and intensive supervision and treatment" plan in the community, *id.* §§ 10.07(f), 10.10(a), 10.11(a).  In the first phase, the fact-finder can be either the jury or the court.  *Id.* § 10.07(d).

psychologists, Drs. Frances Charder and Stuart Kirschner, who had examined Petitioner (SR. 147) and diagnosed him with Narcissistic Personality Disorder ("NPD"),[4] Antisocial Personality Disorder ("ASPD"),[5] and Other Specific Paraphilic Disorder (Nonconsent) ("OSPD (nonconsent)")[6] (SR. 119–47).   Petitioner sought the *Frye* hearing to determine whether OSPD (nonconsent) had received general acceptance in the psychiatric and psychological communities so as to make expert testimony on the diagnosis admissible.  (SR. 142.)  The motion was denied on February 11, 2015.  (SR. 383–88.)

From June through September 2015, the Supreme Court of the State of New York, Queens County ("Trial Court"), conducted a bench trial to determine whether Petitioner suffers from a mental abnormality.  (SR. 389–664.)  Petitioner was represented by counsel throughout the trial. (SR. 389.)  At the trial, Drs. Charder and Kirschner testified on behalf of the State and Dr. Leonard Bard testified on behalf of Petitioner.  (*Id.*)  Drs. Charder and Kirschner both testified that Petitioner suffers from NPD, ASPD, and OSPD (nonconsent).  (SR. 141, 200.)  Dr. Kirschner testified that "the mixture of the antisocial and narcissistic component combined with his paraphilia creates . . . a predisposition for sexual offending with having no trepidation or remorse about it."  (SR. 519.)  In describing how OSPD (nonconsent) was diagnosed, Dr. Kirschner

---

[4]  NPD is characterized by "a pervasive pattern of grandiosity, need for admiration, and lack of empathy that begins by early adulthood and is present in a variety of contexts."  (SR. 134.)

[5]  ASPD is characterized by "a pervasive pattern of disregard for, and violation of, the rights of others, that begins in childhood or early adolescence and continues into adulthood."  (SR. 131.)

[6]  "Paraphilia is a persistent and intense fantasy or attraction to or behavior towards any subject or object other than a normal age, appropriately aged consenting individual and involves a drive to enact the fantasy connected to that paraphilic disorder."  (SR. 425.)  OSPD (nonconsent) "does not meet the criteria for any specific paraphilic disorder" (SR. 129); however, it is intended to describe a person whose paraphilia is towards nonconsensual sex (SR. 425–26).

explained that although the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("the DSM-5") only contains eight paraphilic disorders, it is "very clear" that there are many more. (SR. 516.)  If a clinician diagnoses someone with a paraphilia outside the eight listed, the DSM-5 instructs the clinician to use the diagnostic label "other [specified] paraphilic disorders."  (SR. 516.)  Dr. Kirschner also testified that Petitioner's "sexual urges, fantasies and his inability to control his impulses are existing today in the same way that they existed 30 years ago." (SR. 544.)  Dr. Kirschner concluded that given Petitioner's cognitive distortions, emotional issues, and limited volitional capacity,[7] his case is the "definition of a mental abnormality."  (SR. 521.)

Dr. Charder similarly found that the combination of the NPD, ASPD, and OSPD (nonconsent) disorders affected Petitioner's ability to control his sexual behavior and that Petitioner suffers from a mental abnormality.  (SR. 477.)  Dr. Charder also testified that Petitioner's NPD manifests itself with a strong sexual component.  (SR. 463.)  In the post-psychological examination report, Dr. Charder, noting Petitioner's involvement in a consensual sexual relationship with his girlfriend in 1984, explained that committing rape during this time "illustrate[d] that his sexual interest in over[-]powering and coercing sex from nonconsenting women . . . undermined his ability to control himself."  (SR. 141.)  Petitioner's expert, Dr. Bard, testified that he did not believe that Petitioner suffered from ASPD, that OSPD (nonconsent) should not be used in a civil confinement proceeding, and that the NPD diagnosis was "far from anything."  (SR. 611.)

---

[7] Dr. Kirschner found that Petitioner's cognitive distortions were evidenced by his belief that his victims "appreciated" the sexual assaults, that his emotional issues related to his inability to control his anger, and that his limited volitional capacity was evidenced by his own admission that he could not control his urges.  (SR. 521.)

At the conclusion of the trial, the Trial Court credited the testimony of the State's experts, finding that Petitioner suffers from a mental abnormality, and set a date for phase two of Petitioner's Article 10 proceeding, *i.e.*, the disposition hearing to determine whether Petitioner should be committed to a secure treatment facility or undergo a strict and intensive supervision and treatment plan in the community.  (SR. 663.)  In February 2016, the dispositional hearing was conducted, with Drs. Charder, Kirschner, and Bard all testifying again.  (SR. 665–848.)  Petitioner was again represented by counsel.  (SR. 665.)  Following the hearing, the Trial Court determined that the State had met its burden and that Petitioner should be committed to a secure treatment facility.  (SR. 847.)

Petitioner, again represented by counsel, appealed the Trial Court's decision to the Supreme Court of the State of New York Appellate Division, Second Department ("Appellate Division"), asserting four grounds for reversal: (1) the Trial Court erred in denying Petitioner's motion to conduct a *Frye* hearing (SR. 43–50); (2) the expert testimony on Petitioner's Wiccan religious beliefs was irrelevant, prejudicial, and a violation of his state and federal constitutional rights of religious freedom and equal protection (SR. 51–60); (3) the State failed to present sufficient evidence to support a finding that Petitioner suffers from a mental abnormality (SR. 60–78); and (4) the Court erred in concluding that Petitioner should be confined to a secure treatment facility (SR. 78–89).

On March 30, 2018, the Appellate Division remitted the matter to the Trial Court to conduct a *Frye* hearing to determine whether OSPD (nonconsent) had received general acceptance in the psychiatric and psychological communities.  (SR. 898–99.)  Following the *Frye* hearing, the Trial Court determined that the diagnosis of OSPD (nonconsent) was not generally accepted, and, therefore, the testimony on OSPD (nonconsent) by Drs. Charder and Kirschner at Petitioner's

bench trial was inadmissible.  (SR. 2830.)  Petitioner submitted a supplemental brief to the Appellate Division in light of the *Frye* hearing outcome.  (SR. 2836–2930.)  In addition to his initial grounds for reversal, Petitioner argued that the State, by relying on the inadmissible OSPD (nonconsent) diagnosis testimony, had failed to present legally sufficient evidence to support a mental abnormality finding at phase one of Petitioner's Article 10 proceeding.  (SR. 2879–2901.)

By decision dated February 5, 2020, the Appellate Division affirmed the Trial Court's finding that Petitioner suffers from a mental abnormality and that he requires civil confinement. (SR. 3279–81.)  The Appellate Division reasoned that while the OSPD (nonconsent) testimony should not have been admitted, it was harmless error and that "there was no reasonable possibility that, had this testimony been excluded, the court would have reached a different verdict."  (SR. 3280–81.)  The Appellate Division further concluded that the remainder of Petitioner's contentions were either unpreserved for appellate review or without merit.  (SR. 3281.)  Petitioner filed a motion for leave to appeal (SR. 3167–3236), which was denied by the New York State Court of Appeals (SR. 3283).

## LEGAL STANDARDS

### I.  State Court Exhaustion Requirement Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") constrains review of state-court decisions in *habeas* proceedings.  Under AEDPA, a claim must be "adjudicated on the merits" in state court to serve as a basis for habeas relief  28 U.S.C. § 2254(b)(1);[8] *see also*

---

[8] While the issue of whether an action challenging civil confinement is appropriately brought under 42 U.S.C. § 2254 or § 2241(c)(3) is "not always straightforward," the Court finds that § 2254 is the appropriate vehicle for Petitioner to challenge his civil commitment because Petitioner challenges the commitment itself, not its conditions.  *Henry v. Murphy*, No. 17-CV-5852 (VSB) (BCM), 2018 WL 7291456, at *6 n.5 (S.D.N.Y. Oct. 31, 2018), *report and recommendation adopted*, 2019 WL 289865 (S.D.N.Y. Jan. 23, 2019); *see also Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314 (2d Cir. 2020) ("While in the custody of the New York State Office of Mental Health, Janakievski filed a *pro se* petition for a writ of habeas corpus pursuant to 28

*Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) ("If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]" (internal quotation marks and citation omitted)).  A claim is "adjudicated on the merits" in state court if the state court "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).

This exhaustion requirement includes two parts.  First, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005) (emphasis omitted) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  In New York, a *habeas* petitioner must first appeal the relevant conviction to the Appellate Division, and then seek further review by applying to the New York Court of Appeals for a certificate granting leave to appeal.  *Id.* at 74 (citing, among other things, *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000)).  Second, *habeas* petitioners must have "'fairly presented [their] claims to the state courts,' such that the state court had a fair opportunity to act." *Id.* at 73 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Aparicio*, 269 F.3d at 89–90 ("To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of the same federal constitutional claim[s] that he now

---

U.S.C. § 2254. His petition challenged the validity of the original state-court order . . . as well as three subsequent orders that extended the duration of the confinement."); *Terry P. v. Bosco*, No. 14-CV-5907 (DLI), 2019 WL 3388807, at *3 (E.D.N.Y. Jul. 25, 2019) (evaluating Petitioner's challenge to involuntary civil commitment pursuant to New York Mental Hygiene Law § 10.01 under 42 U.S.C. § 2254); *Best v. Barbarotta*, No. 12-CV-6218 (NGG), 2016 WL 1588501, at *1 (E.D.N.Y. Apr. 19, 2016) (§ 2254 "is the proper vehicle for a challenge to involuntary civil commitment").

urges upon the federal courts to the highest court in the pertinent state." (internal quotation marks and citations omitted)).

A *habeas* petition, however, "may be denied on the merits, notwithstanding the failure of the [petitioner] to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Additionally, the exhaustion requirement may be excused if "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the [petitioner]." *Id.* § 2254(b)(1)(B).

## II.    Federal Court Adjudication on the Merits Under AEDPA

*Habeas* relief is improper unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court cases, or (2) decides a case differently from the Supreme Court given "materially indistinguishable" facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision involves an "unreasonable application" of clearly established federal law if it (1) correctly identifies the governing legal rule but "unreasonably applies it" to the instant case, or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. An unreasonable application "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

Where, however, a federal claim has not been adjudicated on the merits in the state court, "AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III.   *Pro Se* **Petitions**

The Court construes the Petition liberally and interprets it "to raise the strongest arguments that [it] suggest[s]" because Petitioner is proceeding *pro se*. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*) (emphasis and citation omitted).  However, "pro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'"  *Id.* at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)); *accord O'Neal v. New York*, 465 F. Supp. 3d 206, 216 (E.D.N.Y. 2020).

## DISCUSSION

Construed liberally, the Petition raises three separate issues.  First, the Appellate Division erred in determining that admission of the OSPD (nonconsent) testimony at Petitioner's bench trial, which was later determined to be inadmissible, constituted "harmless error."  (Petition, ("Pet."), Dkt. 1, at 8–10.)  Second, the Trial Court lacked sufficient evidence under state law to support its findings that Petitioner suffers from a mental abnormality and is a dangerous sex offender requiring confinement, and that the lack of sufficient evidence violated his right to Due Process under the Fourteenth Amendment.  (*Id.* at 4–7, 10–11.)  Third, the admission of testimony on Petitioner's Wiccan religious beliefs was prejudicial and a violation of his First and Fourteenth Amendment rights.  (*Id.* at 11–12.)

## I.   **Appellate Division's Harmless Error Determination**

Petitioner contends that the Appellate Division erred in finding that admission of the OSPD (nonconsent) testimony was harmless.  (*Id.* at 8.)  A "harmless error" determination does not

9

implicate a "freestanding federal constitutional right," but is purely a question of state law and not reviewable in a federal *habeas* proceeding. *Freeman v. Kadien*, 684 F.3d 30, 34 (2d Cir. 2012) ("A harmlessness determination regarding an underlying error of state law does not implicate a freestanding federal constitutional right. Rather, the harmfulness of evidence admitted in violation of state law is itself a question of state law to which the federal 'substantial and injurious effect' standard does not apply."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). However, a district court may review an error of state evidentiary law to assess whether the error deprived Petitioner of his due process right to a "fundamentally fair trial." *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004). An evidentiary error rises to this level if the evidence is "so extremely unfair that its admission violates fundamental conceptions of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998). Thus, in the context of criminal trials, the Second Circuit has explained that "the erroneously admitted evidence, viewed objectively in light of the entire record," must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (internal quotation marks omitted).

Here, the admission of testimony regarding OSPD (nonconsent), while erroneous, was not so material as to provide the basis for Petitioner's confinement. The crux of Petitioner's argument is that the OSPD (nonconsent) diagnosis, which the Trial Court found on remand was not generally accepted by the scientific community, "was crucial to and permeated every aspect of" Petitioner's "mental abnormality trial." (Pet., Dkt. 1, at 8–9.) However, the diagnostic label itself is not determinative of Petitioner's due process claim; rather, what is important is how the diagnosis explains *Petitioner's behavior and manifestations*. In other words, "a diagnostic label . . . will

10

rarely be dispositive in determining whether an impairment is sufficiently substantial to seriously impair volition;" rather, "it is the manner in which the condition manifests itself in the individual that will determine whether a particular commitment decision comports with due process." *Terry P. v. Bosco*, No. 14-CV-5907 (DLI), 2019 WL 3388807, at *6 (E.D.N.Y. Jul. 25, 2019) (internal quotation marks and citations omitted).

In diagnosing Petitioner with OSPD (nonconsent), Dr. Charder explained that the events that resulted in Petitioner's 1984 criminal convictions "illustrate[] that his sexual interest in over[-]powering and coercing sex from nonconsenting women, fueled by his grandiosity and disregard for the rights of others quickly undermined his ability to control himself and will more likely than not do so again." (SR. 141.)  Challenging the "diagnostic label" assigned to this behavior does not discredit the underlying analysis.  As the Trial Court noted, while OSPD (nonconsent) may not be generally accepted in the psychological and psychiatric community, there is nonetheless "merit" in the distinctions it draws between sex offenders whose actions are driven by different paraphilias. (SR. 2828.)  This is consistent with Dr. Kirschner's testimony that the actual diagnosis of OSPD (nonconsent) was what the DSM-5 instructed clinicians to do if a paraphilia does not match one of the eight listed.  (SR. 516.)  And as the Appellate Division determined as a matter of state law, Petitioner's other diagnoses, ASPD and NPD, together were sufficient to support a finding of mental abnormality, where the State showed Petitioner's NPD "manifests with a strong sexual component . . . [creating a] predisposition to commit sex offenses."  (SR. 3279–81.)  As the Trial Court and Appellate Division both effectively found, it is the behavior, not the "diagnostic labels" that seek to explain the behavior, that is dispositive.  Therefore, the admission of testimony on OSPD (nonconsent) at the bench trial was not a "sufficiently material" error in Petitioner's Article

11

10 proceeding and did not deprive Petitioner of due process with respect to his civil commitment. *Collins*, 755 F.2d at 19.

As outlined above, diagnostic labels such as OSPD (nonconsent) are "rarely dispositive," rather, the focus of the inquiry is on the behavior and manifestations those labels seek to explain. This difference is critical in the cases cited by Petitioner.  Petitioner relies on *Zappula v. New York*, 391 F.3d 462 (2d Cir. 2004)[9] to argue that a prosecutor's reliance on erroneously admitted evidence is an important factor in determining the significance of the error.  (Pet., Dkt.1, at 8.) While Petitioner is correct that *Zappula* identifies this as a factor, there are several factors identified by the court including: (1) "the overall strength of the prosecution's case;" (2) "the prosecutor's conduct with respect to the improperly admitted evidence;" (3) "the importance of the wrongly admitted testimony;" and (4) "whether such evidence was cumulative of other properly admitted evidence."  391 F.3d at 468.  In analyzing these factors, the *Zappula* panel determined that (1) the prosecutor's case was relatively weak, as evidenced by an initial mistrial where the jury was unable to reach a verdict, (2) the prosecutor viewed the improperly admitted evidence as central to the case, given that it was the first piece of evidence referenced during the re-trial, and (3) the evidence was extremely important because "a signed confession cannot be underestimated."  *Id.* at 468–73.  Petitioner's case is distinguishable on all accounts.  First, as discussed below, *see infra* Discussion Part II, there was significant evidence in the record even without the OSPD (nonconsent) testimony that suggested that Petitioner suffers from a mental abnormality.   Second, while OSPD (nonconsent) was frequently referenced throughout Petitioner's Article 10 proceedings, its use was more descriptive, *i.e.*, describing a particular

---

[9] *Zappula* was a criminal prosecution, in which the *habeas* petitioner was convicted of second-degree murder after the trial court erroneously admitted petitioner's defective confession, given without *Miranda* warnings, that he committed the murder.  391 F.3d at 468.

paraphilia, than dispositive, *i.e.*, that Petitioner suffers from a mental abnormality *because* of the OSPD (nonconsent) diagnosis.  This contrasts with the written confession in *Zappulla* where the evidence was presented as dispositive of the petitioner's guilt.  Third, and most importantly, the OSPD (nonconsent) testimony introduced at Petitioner's Article 10 proceedings does not rise to the same level of importance as a signed confession of a criminal defendant.  As the Second Circuit explained in *Zappulla*, "[t]he fact that the evidence at issue is a signed detailed confession should weigh heavily against finding that its erroneous admission was harmless."  *Id.* at 473.  *Zappulla* is therefore materially distinguishable from the present case and does not support the conclusion that admission of the OSPD (nonconsent) testimony harmed Petitioner.

Petitioner also cites *Fuentes v. T. Griffin*, 829 F.3d 233 (2d Cir. 2016) as an example of an evidentiary error that can warrant *habeas* relief.  (Pet., Dkt. 1, at 9.)  In *Fuentes*, the petitioner was convicted of first degree rape and first degree sodomy after the prosecution failed to disclose a psychiatric evaluation of the alleged rape victim.  *Fuentes*, 829 F.3d at 236.  The Second Circuit granted *habeas* relief, holding that the evidence suppression violated the petitioner's due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) due to the "uniquely important nature of the [psychiatric record] . . . , where [the alleged victim] provided the only evidence that Fuentes's conduct was a crime and where the [psychiatric record] was the only evidence by which the defense could have impeached [the alleged victim's] credibility as to her mental state."  *Id.* at 253.  Similar to *Zappulla*, the evidentiary error was "uniquely important" and central to the defendant's criminal conviction.  As discussed above, the inadmissible testimony in this case does not rise to that level and, therefore, renders the Second Circuit's harmless-error determination in *Zappulla* and *Fuentes* inapplicable here.

## II.     Sufficiency of the Evidence and Due Process

Petitioner contends that absent testimony on OSPD (nonconsent), the State lacked legally sufficient evidence to show that Petitioner (1) suffers from a mental abnormality and (2) is a dangerous sex offender requiring confinement.  (Pet., Dkt. 1, at 4–7.)  Petitioner challenges the legal determinations made by the Trial Court during both phases of his Article 10 proceeding.  (*Id.*)

As discussed, under AEDPA, federal *habeas* relief "pursuant to the judgment of a State court" is only appropriate if the state court's "adjudication of the claim" either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence. . . ."  28 U.S.C. § 2254(d).  "Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision."  *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quotation omitted).  A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in [Supreme Court cases]," or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (quotations omitted).  A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.* (quotation omitted).

AEDPA establishes a deferential standard of review—"'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001)

(quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)); *see also Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (observing that where a state court adjudicates a federal constitutional claim on the merits, "we must apply AEDPA deference").  Under this standard, the Court must "assess whether the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Garner v. Lee*, 908 F.3d 845, 861 n.14 (2d Cir. 2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo.'"  *Dolphy*, 552 F.3d at 238 (quoting *Spears*, 459 F.3d at 203).

Here, the Trial Court's findings in both phases of the Article 10 proceeding and the Appellate Division's review were neither "contrary to" nor an "unreasonable application of" "clearly established federal law."  28 U.S.C. § 2254(d).  The Trial Court's determination that Petitioner suffers from a mental abnormality that makes him a dangerous sex offender requiring confinement was based on the testimony of Drs. Kirschner and Charder, who both testified that Petitioner had an "inability to control his impulses."  (SR. 434, 544.)  The determination was reached not because of a particular diagnosis, but rather a plethora of evidence discussed below.  This is significant.

In *Kansas v. Crane*, the United State Supreme Court stated:

[W]e did not give to the phrase "lack of control" a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, "inability to control behavior" will not be demonstrable with mathematical precision. It is enough to say that there must be *proof of serious difficulty in controlling behavior*. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental

15

> illness, abnormality, or disorder subjects him to civil commitment from the
> dangerous but typical recidivist convicted in an ordinary criminal case.

534 U.S. 407, 413 (2002) (emphasis added) (internal citations omitted). The Supreme Court's rule emphasizes that it is not a particular diagnosis that forms the basis for confinement; rather, the question is whether "the condition . . . is serious enough to cause an inability to control sexually violent behavior." *Brown v. Watters*, 599 F.3d 602, 614–15 (7th Cir. 2010); *Terry P.*, 2019 WL 3388807, at *6 ("Moreover, it is not the diagnosis alone, in the abstract, that is the focus in assessing the constitutionality of a civil commitment but how the mental disorder manifests itself in the individual, particularly as regards its effect on his ability to control his behavior.") (internal citations omitted).

Relying on the testimony that Petitioner has an "inability to control his impulses" and correctly applying the rule from *Crane*, the Appellate Division's analysis focused not on a particular diagnosis but rather how the diagnosis related to Petitioner's "serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413. The Appellate Division explained that evidence that Petitioner's NPD "manifests with a strong sexual component . . . [creating a] predisposition to commit sex offenses" supported both the mental abnormality finding and was "clear and convincing evidence" that Petitioner has "serious difficulty controlling his sexual conduct." (SR. 3281.)

Additional testimony from the Trial Court's bench trial supports this conclusion. Citing Petitioner's psychological evaluation and sex offender treatment, Dr. Kirschner observed that Petitioner has cognitive distortions, difficulties regulating emotions, and issues with volitional capacity that make his case the "definition of a mental abnormality." (SR. 521.) Dr. Charder, noting the circumstances surrounding Petitioner's second conviction, explained that Petitioner's sexual urges in "over-powering" women "undermined his ability to control himself and will more

16

likely than not do so again." (SR. 141.) In sum, the record provides ample support for the Appellate Division's determination that Petitioner suffers from a mental abnormality requiring civil confinement, and that ruling, therefore, is not contrary to, or an unreasonable application of, clearly established federal law; nor is it an unreasonable determination of the facts in light of the evidence presented.

Petitioner's Due Process claim essentially rests on the same basis as his sufficiency-of-the-evidence claim. (Pet., Dkt. 1, at 6.) He argues that because there was insufficient evidence of mental abnormality without the OSPD (nonconsent) testimony, his due process rights were violated. This claim fails for the several reasons.

As an initial matter, this federal constitutional claim does not appear to have been "fairly presented" to the Appellate Division, given that Petitioner's evidence-sufficiency arguments were framed in the context of state evidentiary law. (SR. 1–92, 970–1064, 3060–3131.) While this means Petitioner's claim is unexhausted, *Galdamez*, 394 F.3d at 73, it still may be reviewable under one of the narrow exceptions provided for "procedurally defaulted" claims, *Murray v. Carrier*, 477 U.S. 478, 485 (1986). Petitioner's claim is procedurally defaulted as he has already had one appeal and one application for leave to appeal to the New York Court of Appeals, and therefore can no longer raise the claim in any state forum.[10] *Ramirez v. Attorney Gen.*, 280 F.3d 87, 94–95 (2d Cir. 2001).

When a claim is procedurally defaulted, the District Court can review it only if Petitioner shows either: (1) "cause" for the default and actual prejudice from barring the claim; or (2) that

---

[10] "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals." *Parrish v. Lee*, No. 10-CV-8708 (KMK), 2015 WL 7302762, at *7 (S.D.N.Y. Nov. 18, 2015) (internal quotation marks omitted).

17

the failure to consider the claim will result in a "fundamental miscarriage of justice." *Murray*, 477 U.S. at 485.  Here, with respect to the first exception, Petitioner fails to provide any reason why this claim was not presented to the Appellate Division on appeal, thereby failing to meet the criteria of the first exception.  *Stepney v. Lopez*, 760 F.2d 40, 45 (2d Cir. 1985).  The "fundamental miscarriage of justice" exception, however, is more difficult to apply here given that Petitioner is challenging a bench trial that led to his *civil confinement*.  The Supreme Court has stated that this exception is reserved for "petitions that advance a substantial claim of *actual innocence*."  *Schlup v. Delo*, 513 U.S. 298, 321–22, 325, 327 (1995) (emphasis added).  This criminal standard does not map neatly onto a case involving civil confinement.  There does not appear to be Second Circuit case law interpreting the "actual innocence" standard in the context of civil confinement, nor have other circuits enunciated a clear rule.[11]  *Brown v. Watters*, 599 F.3d 602, 609–10 (7th Cir. 2010) ("The correct application of the actual innocence exception to civil commitment cases is a difficult one. We have no explicit guidance from the Supreme Court or from our sister circuits . . . . [Therefore, we shall] proceed to adjudicate the merits.").

---

[11] There are three potential rules emerging from the sparse case law, each approaching the analysis of "actual innocence" in civil confinement petitions differently.  First, Petitioner must present new evidence that supports a miscarriage of justice claim.  *Schlup*, 513 U.S. at 299 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.")  Petitioner's claim would fail under this test because the Petition does not provide any new evidence.  Second, the "actual innocence" standard can be satisfied if Petitioner can show he does not have a mental abnormality as defined by state law to warrant civil confinement.  *Levine v. Torvik*, 986 F.2d 1506, 1517 n.9 (6th Cir. 1993).  This rule would present a high bar and would likely not be satisfied here, where there exists significant evidence that Petitioner suffers from a mental abnormality.  Third, the Court can decide to "pretermit a discussion" of the "actual innocence" exception and "proceed to adjudicate the merits."  *Brown*, 599 F.3d at 617 n.10.  Under this rule, the Court would proceed to address Petitioner's due process claim on the merits.

However, the Court need not decide whether and how the "actual innocence" exception applies to civil commitments because, having already discussed the sufficiency of the evidence under *Crane*, 534 U.S. 407, the Court finds that Petitioner was not deprived of due process under the Fourteenth Amendment and therefore Petitioner's due process claim does not provide a basis for *habeas* relief.

### III.   Testimony About Petitioner's Wiccan Religious Beliefs

Petitioner contends that the admission of testimony on his Wiccan religious beliefs was prejudicial and violated his First and Fourteenth Amendments rights.  (Pet., Dkt. 1, at 11–12.) Testimony about a person's religious beliefs is proper only if it has "relevance to the issue being decided in the proceeding." *Dawson v. Delaware*, 503 U.S. 159, 160 (1992).  Here, a substantial portion of the Wiccan testimony was related to Petitioner's own invocation of his religious beliefs in his 2005 sex offender treatment program.  (SR. 431–32, 469–70.)  Dr. Charder, in describing the treatment, testified that Petitioner identified similarities in the ritualistic aspects of the Wiccan religion and Petitioner's "cruising," or search, for future victims.  (SR. 431–32.)  Dr. Charder also explained that Petitioner "conflates the notion about the natural life, being important in the [W]iccan religion" with "his anger."  (SR. 472.)  During the dispositional hearing, Dr. Charder testified that Petitioner spoke about his Wiccan beliefs during his psychological evaluation.  (SR. 740.)  The relevance of the testimony was therefore a result of Petitioner himself identifying it as relevant to his sexual misconduct, psychological state, and motivations.  *See United States v. Stewart*, 686 F.3d 156, 167 (2d Cir. 2012) ("The sentencing judge was determining the characteristics of the defendant, which were legally relevant to a determination of the appropriate sentence to impose on [the defendant], through the contents of statements she voluntarily and publicly made.").  Additionally, the testimony was not merely a discussion of Petitioner's "abstract beliefs;" rather, it was directly related to the ways in which his behavior manifests his beliefs.

*Dawson*, 503 U.S. at 162.  Therefore, the Court finds that the testimony was "relevan[t] to the issue being decided in the proceeding," *id.* at 160,[12] and properly admitted and considered by the Trial Court and Appellate Division.

## IV.     Other Considerations

In several of Petitioner's filings, he notes that he does not have access to legal materials nor a law library.  (Pet., Dkt.1, at 2; Dkt. 23, at 2.)  The Court construes this as a denial-of-access-to-the-courts claim.  To state a such a claim, a Petitioner must show an "actual injury" was suffered. *Kaminski v. Semple*, 796 F. App'x 36, 39 (summary order) (2d Cir. 2019) (holding that access to a law library is not a cognizable injury absent dismissal of habeas petition for technical reasons that could have been cured through access to legal materials.)   Here, the Court observes that Petitioner has "adequately and competently set forth his claims" (10/25/2021 Docket Order), and the Court is not dismissing his petition "for a technical deficiency that would have been cured with appropriate legal facilities," *Kaminski*, 796 F. App'x at 39.   Therefore, the Court finds that Petitioner has not alleged an "actual injury" sufficient to state a denial-of-access-to-the-courts claim.

## CONCLUSION

For the reasons set forth herein, the petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is denied in its entirety.  No certificate of appealability is granted with respect to Petitioner's claims, as there is no substantial showing of the denial of a constitutional right.

---

[12] Petitioner notes that Dr. Charder referred to his religious beliefs as "disturbing."  (Pet., Dkt. 1, at 12; SR. 3100.)  The Court does not interpret the relevant section of the transcript in this way.  (*See* SR. 740.)  Dr. Charder notes that certain Wiccan tenets can be "looked at in a positive way," but goes on to say that "under the history and the facts of all [of Petitioner's] crimes," his use of the religion is "disturbing" and potentially a vehicle to "charm and talk to women."  (SR. 740.)

28 U.S.C. § 2253(c)(2); *see Middleton v. Att'ys Gen.*, 396 F.3d 207, 209 (2d Cir. 2005) (petitioner has not shown that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further").  The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 23, 2022
　　　　Brooklyn, New York